# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-0046V

| | |
|---|---|
| MELISSA FERGUSON, | Chief Special Master Corcoran |
| Petitioner, | Filed: March 18, 2024 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Maximillian J. Muller, Muller Brazil, LLP, Dresher, PA, for Petitioner.*

*Alexa Roggenkamp, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On January 4, 2021, Melissa Ferguson filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") resulting from a tetanus diphtheria acellular pertussis ("Tdap") vaccine received on December 20, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons discussed below, I find that record evidence preponderantly establishes that the onset of Petitioner's shoulder pain began within 48 hours of

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

vaccination, she suffered residual effects of her injury for more than six months, and she has satisfied the remaining requirements for entitlement.

## I.     Relevant Procedural History

Over a year after this case was activated, Respondent filed his Rule 4(c) Report asserting that this case was not appropriate for compensation (ECF No. 28). Thereafter, Petitioner filed additional evidence and a motion for a ruling on the record that she is entitled to compensation (ECF Nos. 29, 31, 32). Respondent responded (ECF No. 33), and Petitioner replied (ECF No. 34). The matter of Petitioner's entitlement to compensation is now ripe for resolution.

## II.    Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment,

or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they:

(i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time-frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

4

## B. Relevant Factual History

This ruling contains only a brief overview of facts most relevant to the parties' dispute.

### 1. Medical Records

On December 20, 2019, Petitioner received a Tdap vaccine intramuscularly in her left deltoid. Ex. 1 at 1. Six days later (December 26, 2019), her orthopedist, Dr. Rick Compton, performed arthroscopic surgery on her right knee. Ex. 4 at 16-17. She saw Dr. Compton for a post-operative visit for her knee four days later (December 30, 2019). *Id.* at 13. Her wound was clean and dry with no sign of infection. *Id.* The record does not mention her left shoulder.[4] *Id.* Petitioner thereafter attended five sessions of physical therapy ("PT") for her right knee between January 3 and January 22, 2020, with no mention of her left shoulder. Ex. 10 at 44, 48, 52, 56, 59. She saw her primary care provider ("PCP") Dr Kevin Allen Carter on January 7, 2020 concerning sleep apnea and insomnia, with no mention of shoulder pain. Ex. 6 at 41.

Twenty days after vaccination (January 9, 2020), however, Petitioner went to CareFirst Urgent Care complaining of left upper arm/shoulder pain since receiving a tetanus vaccine on December 20, 2019 at her PCP's office. Ex. 12 at 9. She described it as a "shooting" pain, and rated it seven out of ten. *Id.* She had taken over-the-counter medications without relief, although she saw some improvement over the prior week. *Id.* On examination, her left shoulder had limited range of motion ("ROM") with extension and flexion. *Id.* at 10. The provider noted "probable vaccine related pain d/t [due to] injection technique," and prescribed prednisone and cyclobenzaprine. *Id.*

Four days later (January 13, 2020), Petitioner returned to Dr. Compton for a post-operative follow up for her right knee. Ex. 4 at 12. She now reported that she was also concerned about her left shoulder, which was exhibiting pain and weakness. *Id.* She had an injection done, and felt there was "something wrong with her shoulder since that time." *Id.* On examination, Dr. Compton noted no tenderness over the acromioclavicular joint or subacromial area, but mild tenderness to palpation in the deltoid area. *Id.* She had limited ROM secondary to pain. *Id.* X-rays of her left shoulder were normal. *Id.* He assessed her with left shoulder pain after injection, and recommended PT for both her knee and shoulder. *Id.* An ultrasound of her left arm the same day was unremarkable. Ex. 5 at 51.

---

[4] The record of this visit is quite short. It is a form with Petitioner's name and the date of the visit filled in by hand, along with "#1 knee scope." Ex. 14 at 13. At the bottom in a special instructions section it says "PT." *Id.* Other than this, only check marks and indecipherable words appear on the page. *Id.*

She also saw her OB-GYN on January 13th and complained of "shocking abrupt pain in Right[5] arm after getting Tetanus shot at PCP office on 12/20/19." Ex. 7 at 43.

On January 28, 2020, Petitioner attended PT for her left shoulder and right knee. Ex. 10 at 39. She reported shoulder pain ranging from one to ten out of ten, and that she was unable to sleep on her left side. *Id.* at 39-40. She reported that she had a tetanus shot on December 20th, and that she felt a "flash of burning pain" as the injection went in. *Id.* at 40. Her shoulder was sore the weekend afterward. *Id.* By Christmas (five days after vaccination), she had difficulty moving her arm, and excruciating pain with certain movements. *Id.* Some of the pain had subsided, but she continued to have difficulty moving her arm. *Id.* On examination, her left shoulder active ROM was reduced compared to her right arm, and her left shoulder exhibited reduced strength. *Id.* at 40-41. Hawkins-Kennedy Impingement, Neer Impingement, and Empty Can tests were all negative. *Id.* at 41.

On February 3, 2020, Petitioner saw Dr. Compton for her left shoulder and right knee. Ex. 4 at 11. At that point, her knee was doing somewhat better, but she had not done much therapy for her shoulder. *Id.* She was given Meloxicam, though it is not clear which condition this was for, and was instructed to continue PT. *Id.* Possible imaging of her shoulder was discussed. *Id.* She saw Dr. Compton again for her knee on February 19, 2020 and received an injection in her knee, with no mention of her shoulder. *Id.* at 10.

Petitioner attended seven PT sessions for her shoulder through March 10, 2020. Ex. 10 at 8-41. When she stopped PT on March 10, 2020, her shoulder pain ranged from one to five out of ten, and she still could not sleep on her left side. *Id.* at 8. Her pain was aggravated by reaching across her body. *Id.* She stated that she was having difficulty going out in public and attending PT due to concerns about germs. *Id.* at 11. After March 10th, she did not show up for a scheduled appointment and did not respond to phone calls and emails offering to reschedule or for telehealth. *Id.* at 9. She was discharged with a good prognosis. *Id.*

Dr. Compton called Petitioner about her knee on March 27, 2020. Ex. 4 at 9. She said the injection at her prior appointment had helped her knee somewhat, and did not mention her shoulder. *Id.* She next saw Dr. Compton for her knee pain almost three months later - on June 25 and June 29, 2020 – but made no mention of her shoulder. *Id.* at 7-8.

On July 16, 2020, Petitioner saw orthopedist Dr. Frank Noyes for a second opinion on her right knee pain. Ex. 9 at 12. The record does not mention her shoulder. *Id.* Petitioner saw Dr. Elaine Fogle for a well-adult examination on July 28, 2020. Ex. 3 at 16-

---

[5] The parties agree (and I accept) that the reference to her right arm in this record is likely a typographical error. Petitioner's Motion for a Ruling on the Record, filed Feb. 17, 2023, at *3 n.1 (ECF No. 32); Respondent's Response, filed April 17, 2023, at *3 n.1 (ECF No. 33).

29. The record does not mention shoulder pain, but notes severe anxiety that was resulting in near panic attacks. *Id.* at 25. She saw Dr. Mansi Amin for hypertension on September 15, 2020, with no mention of shoulder pain. Ex. 8 at 4.

On October 19, 2020, Petitioner returned to Dr. Compton for treatment of her prior left shoulder pain. Ex. 4 at 6. The record documents "continued pain," explaining that she had been seen for this earlier in the year. *Id.* She completed PT and "had some temporary relief of her symptoms; however [they had] recurred." *Id.* She was taking Aleve, and described her pain as severe, causing difficulty with daily activities and occasional night pain. *Id.* On examination, her left shoulder was tender over the acromioclavicular joint and mildly tender in the subacromial area. *Id.* She had limited ROM secondary to pain, and positive impingement and cross arm test results. *Id.* Dr. Compton's assessment was left shoulder impingement and degenerative joint disease, and he wanted to rule out a rotator cuff tear. *Id.*

Noting that conservative measures had failed, Dr. Compton ordered an MRI. Ex. 4 at 6. The MRI was done three days later (October 22, 2020), and showed a deep partial-thickness intrasubstance tear of the infraspinatus tendon. *Id.* at 18. No fluid was seen in the subacromial/subdeltoid bursa, confirming the absence of a full-thickness rotator cuff tear. *Id.* The other tendons were intact, and the long head of the biceps tendon was intact and located within the bicipital groove. *Id.* She had a type IV acromion, with no degenerative changes seen or bone marrow edema present. *Id.*

Petitioner followed up with Dr. Compton on October 28, 2020, to review the MRI findings. Ex. 4 at 5. He noted that in his experience, it was "unusual to have an isolated infraspinatus tear without involving the supraspinatus." *Id.* He also stated that her type IV acromion was "a relatively new development," but did not appear to be related to an impingement. *Id.* He was not sure that surgery would help. *Id.* He suggested a second opinion with Dr. Samar Hasan. *Id.*

Petitioner saw Dr. Hasan for left shoulder pain on November 25, 2020. Ex. 9 at 7. She had been having the pain since December 2019, when she received a tetanus shot in her shoulder. *Id.* At the time of vaccination, she felt "immediate pain that shot down her arm." *Id.* She had attended PT before "coronavirus shut everything down." *Id.* "Over the quarantine" she had noticed that her shoulder pain had improved slightly, but she continued to have lingering soreness and pain. *Id.* She rated her pain as two out of ten. *Id.* On examination, tenderness was noted over the greater tuberosity and infraspinatus insertion. *Id.* at 9. Her left shoulder active ROM was 150 degrees in forward flexion, 140 degrees in abduction, and 45 degrees in external rotation. *Id.* She had negative impingement findings, labral findings, Speed sign, Yergason sign, Crossover sign, belly press sign, and lift off sign. *Id.* Her right shoulder had the same ROM and other findings. *Id.* Dr. Hasan assessed Petitioner with chronic left shoulder pain and adhesive capsulitis.

*Id.* at 10. He administered a steroid injection and recommended that she resume PT. *Id.* He prescribed Mobic and instructed her to stop over the counter anti-inflammatories. *Id.*

Petitioner underwent a PT evaluation of her left shoulder on December 31, 2020. Ex. 13 at 39. The record states that her pain began with a tetanus shot before her knee surgery the year before, which resulting in shooting pain in her left shoulder and arm. *Id.* She began PT earlier in the year, but stopped due to COVID-19. *Id.* She reported pain levels ranging between two and seven out of ten. *Id.* Her left shoulder active ROM was 128 degrees in flexion, 165 degrees in abduction, 44 degrees in internal rotation, and 70 degrees in external rotation. *Id.* at 40. The therapist noted that her symptoms were consistent with her referral diagnosis of adhesive capsulitis versus left partial infraspinatus tear. *Id.* at 42. Petitioner attended a total of eight PT sessions between December 31, 2020 and February 10, 2021. Ex. 13 at 11-42. At discharge, she had significantly progressed with ROM and strength. *Id.* at 16. She requested to be discharged due to external factors, and was interested in further PT in the coming months. *Id.* at 11-12.

## 2. Declarations

Petitioner submitted three declarations in support of her claim. Exs. 2, 11, 14. Petitioner states that when she received the tetanus vaccine just before her knee surgery, she "felt an immediate burning pain shoot all the way down her arm to [her] hand." Ex. 11 at ¶ 3. Over the next several days, she was "in agony." *Id.* at ¶ 4. After her knee surgery, she was recovering from both surgery and her shoulder injury. *Id.* at ¶ 5. She was given pain medication for her knee that helped her arm as well. *Id.* At her knee surgery follow up a week or so later, she asked the surgeon about her arm, and he said she may need to see a specialist. *Id.*

She continued to deal with a very painful arm until she had to stop PT due to COVID-19 in March 2020. Ex. 11 at ¶¶ 6, 10. She had made some improvement with PT, but the pain never went away. *Id.* at ¶ 11. She continued to do exercises she learned in PT at home, and self-treat because she "was not comfortable going to PT for the rest of the year due to Covid risks." *Id.* She continued to complain about her arm to family and friends, and states that she posted about it on Facebook.[6] *Id.* at ¶ 7.

Petitioner is a public school teacher, and used summer break to continue to recover. Ex. 11 at ¶¶ 8-9. Despite the treatment gap from March to October 2020, she "absolutely suffered the residual effects of this injury long past six months." Ex. 14 at ¶ 3. She states that during this time, "[w]e were literally in the throes of a worldwide pandemic."

---

[6] Petitioner has not filed the Facebook posts. In his response, Respondent included a footnote "renew[ing] his request, originally made in his Rule 4(c) report, for any posts from petitioner's Facebook account related to her shoulder pain." Respondent's Response, filed April 17, 2023, at *3 n.2 (ECF No. 33). While Petitioner may file these posts, I do not consider them necessary for this ruling.

*Id.* She explains that a PT environment is a "high stress, panic-inducing situation," due to constantly having "to touch therapy equipment that countless others had used." *Id.* Although employees worked to sanitize equipment, PT equipment such as stretch ribbons and bouncy balls are difficult to sanitize. *Id.* People she knew were dying, and she decided not to go to in-person PT, but continue exercises at home to the best of her ability. *Id.* at ¶ 10.

Petitioner states that the assertion that she did not mention her shoulder during visits to Dr. Compton for her knee is "not necessarily accurate," although she does not specify which visits she references. Ex. 14 at ¶ 4. She believes that she did mention it to him, "perhaps as a side-note," and it is possible he did not document this. *Id.* She states that she was "just surviving a pandemic and the day-to-day" and "wasn't thinking about perfectly documenting things for a lawsuit." *Id.* at ¶ 5. She grew up on a farm, where "[y]ou toughed things out and got on with it, which is what I tried to do with my shoulder." *Id.* She returned to the doctor in the fall of 2020 because she was still having significant shoulder pain. Ex. 11 at ¶ 12. She concludes that "prior to December 2019, my left shoulder was healthy and normal. Immediately after the injection, that changed; the symptoms never went away." Ex. 14 at ¶ 9.

### C. The Parties' Arguments

Petitioner argues her shoulder pain began within 48 hours of vaccination, and that she "continuously and consistently related the onset of her shoulder pain back to the Tdap vaccination." Petitioner's Motion for a Ruling on the Record, filed Feb. 17, 2023, at *7 (ECF No. 32) ("Mot."). She presented to urgent care on January 9, 2020 – 20 days after vaccination – complaining of a very painful and sore arm since her December 20th Tdap vaccination. Mot. at *7. She told her orthopedist and OB-GYN four days later that she had shoulder pain since the Tdap shot. *Id.* And at her January 28, 2020 PT evaluation, she described a flash of burning pain at the time of vaccination on December 20th. *Id.* at *8. Although the records do not indicate that she reported her shoulder pain at her post-operative visit for her knee, or subsequent two PT appointments for her knee, Petitioner states that this is because she was recovering from knee surgery and focused on post-operative care including having sutures removed and regaining the ability to walk. *Id.*

With respect to severity, Petitioner asserts that she sought treatment with an orthopedist and attended PT until March 10, 2020. Mot. at *9. At that point, she stopped PT due to the COVID-19 pandemic, but continued to have shoulder problems during that time. *Id.* at *9-10. When she returned for additional shoulder treatment in October 2020, she reported "continued pain." *Id.* at *10. While PT had provided temporary relief, the pain had returned and she was having difficulty with everyday activities. *Id.* Although the medical records describe her symptoms in somewhat different terms, Petitioner argues that she consistently complained of significant pain and reduced ROM throughout her

course of treatment, supporting a finding that she suffered one continuous injury where in-person PT was suspended due to the COVID-19 pandemic. *Id.* at *11.

Respondent argues that Petitioner has not shown by preponderance evidence that she experienced sequela of her injury for more than six months. Response to Petitioner's Motion for a Ruling on the Record, filed April 17, 2023, at *6 (ECF No. 33) ("Resp."). Respondent emphasizes the "substantial temporal gap in medical records" documenting symptoms or sequela as weighing against a finding that the severity requirement is satisfied. *Id.* at *6-7 (*citing Francis v. Sec'y of Health & Human Servs.*, No. 20-780V, 2023 WL 146481 (Fed. Cl. Spec. Mstr. Jan. 10, 2023) (severity not met due to 16 month treatment gap); *Spataro v. Sec'y of Health & Human Servs.*, No. 17-1576V, 2021 WL 962442 (Fed. Cl. Spec. Mstr. Feb. 17, 2021) (severity not met due to 11-month treatment gap); and *Kohl v. Sec'y of Health & Human Servs.*, No. 16-748V, 2020 WL 7039121 (Fed. Cl. Spec. Mstr. Nov. 6, 2020) (severity not met due to two year treatment gap)).

Not only did Petitioner experience a substantial gap in treatment, she had multiple intervening medical appointments during that gap that do not document shoulder pain. Resp. at *7. Respondent argues that medical records that are created contemporaneously with the events they describe are presumed to be accurate and complete. *Id.* Although the Federal Circuit has acknowledged that a patient may not necessarily report, or a physician accurately record, every ailment they are experiencing in *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021), Respondent argues that the practice area of physicians is relevant to whether a given record would likely reference a medical issue in the first place. *Id.* (citing *Walker v. Sec'y of Health & Human Servs.*, No. 18-1674V, 2020 WL 4725586, at *5 (Fed. Cl. Spec. Mstr. June 10, 2020) (visit with a PCP likely time to discuss general medical concerns)). In this case, during the seven-month gap in treating her shoulder, Petitioner saw "Dr. Compton – an orthopedist who had previously treated her for shoulder pain – *three times*, and did not mention shoulder pain at any of these visits." *Id.* at *8 (emphasis in original). Because Dr. Compton had previously treated her shoulder pain, Respondent asserts that it is reasonable to assume that if Petitioner had symptoms during this time, she would have reported them to him – which she ultimately did in October 2020. *Id.* She also sought treatment from her PCP and a different orthopedist during this gap, and Respondent argues that it would have been reasonable to report her shoulder pain to either of them. *Id.*

Respondent views Petitioner's symptoms prior to March 10, 2020 as distinguishable from what she experienced after October 19, 2020, noting that prior to March 2020 her impingement signs were negative, but that after October 2020 they were positive. Resp. at *8. Petitioner also reported temporary relief of her symptoms during the pandemic, weighing against a finding of continuous shoulder symptoms during the seven-month treatment gap. *Id.*

Respondent also argues that the evidence does not support a finding that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccination because she had four intervening appointments between vaccination and her first report of shoulder pain, three with Dr. Compton and her physical therapist, who presumably would have recorded shoulder complaints if they had been made. Resp. at *9. Respondent adds that Petitioner's affidavit evidence was created during the course of litigation, and should not be used to substantiate her claim. *Id.* at *10.

In reply, Petitioner argues that the cases Respondent cites for the proposition that a treatment gap weighs against a finding that the severity requirement is satisfied are distinguishable. Petitioner's Reply, filed April 24, 2023, at *1-2 (ECF No. 34) ("Reply"). Petitioner argues that the *Francis* petitioner sought care for three months, followed by a 15 month gap. Reply at *2. *Spataro* involved a petitioner who sought care ten days after vaccination, and not again until 11 months later. *Id.* And in *Kohl*, the petitioner treated for two months, followed by a 16 month gap in treatment. *Id.* Thus, these cases all involve substantially larger gaps in treatment, in addition to other concerns that justified the results therein. *Id.* at *3. Here, by contrast, the seven-month gap "was indisputably caused by the COVID-19 pandemic." *Id.* When Petitioner again sought care for her shoulder in October 2020, she reported "continued pain." *Id.* (*citing* Ex. 4 at 6). When she saw a different orthopedist in November 2020, she reported pain since December 2019 when she received her tetanus vaccine. *Id.* (*citing* Ex. 9 at 7).

As to onset, Petitioner argues that her first visit for shoulder pain was urgent care 19 days after vaccination. Reply at *4. She was recovering from knee surgery, and asserts that "it was reasonable to attend a few postoperative visits while recovering from knee surgery" before seeking care for her shoulder pain, and this does not undermine her claim that her pain began within 48 hours of vaccination. *Id.*

### D. Factual Finding Regarding QAI Criteria for Table SIRVA

#### 1. Onset

After a review of the entire record, I find, based on a preponderance of the evidence, that more likely than not the onset of Petitioner's shoulder pain began within 48 hours of vaccine administration.

Although the records of her first post-operative visit and two PT visits for her knee are silent on shoulder pain, Petitioner has explained that these visits were focused on her knee recovery and regaining the ability to walk. She also explained that she was on pain medication for her knee, which also helped with her shoulder pain. Moreover, she sought care 20 days after vaccination at urgent care. This is not a lengthy treatment delay, and does not cast doubt on her claim. And when she did report shoulder pain, she consistently reported that it had been present since her Tdap vaccination. Exs. 4 at 12; 9 at 7; 10 at 40; 12 at 9.

### 2.  Other SIRVA QAI Criteria

The remaining SIRVA QAI criteria are not contested, and I find that they are satisfied. There is no evidence that Petitioner had a pre-vaccination left shoulder condition, or another condition or abnormality, that would explain her symptoms after vaccination. Ex. 3. And her symptoms were limited to her left shoulder, where she received the Tdap vaccine. Exs. 4, 9, 10, 12, 13.

### E.  Statutory Severity Requirement

I find that preponderant evidence supports a finding that the statutory severity requirement is satisfied. There is no dispute that Petitioner continued treatment for her left shoulder through March 10, 2020, approximately two and a half months after vaccination and the onset of her symptoms, but that she again sought left shoulder treatment seven months later, in October 2020. The parties thus disagree as to whether Petitioner's symptoms continued between March and October 2020, a timeframe which spans the relevant six-month period.

Respondent's position has logic to it, but ultimately is not preponderantly supported. While I accept Petitioner's explanation that she stopped treatment due to COVID-19, she did continue to treat her right knee during this gap, including with *the same doctor* who had previously treated her left shoulder and to whom she later returned for left shoulder treatment. And she saw her PCP during this time. It is reasonable to assume that either of these providers could have provided care for her shoulder if it continued to be symptomatic during this time. But the fact that she did not do so – or, if she did, they did not record it – does not establish that she had no symptoms during this time. Instead, it is consistent with her explanation – that her symptoms improved somewhat during the early months of the COVID-19 pandemic, but worsened again thereafter. (I can also glean from this gap that Petitioner's overall suffering was moderate, permitting her to shoulder the burden of the injury without extensive treatment – although that goes to damages and not severity as a requirement of entitlement).

I thus find that Petitioner meets the severity requirement *barely*. Particularly compelling is the fact that when Petitioner returned to Dr. Compton in October 2020, he treated her injury as a *continuing* injury rather than a new one, noting that conservative measures had failed and immediately ordering an MRI. Ex. 4 at 6. And when she saw Dr. Hasan and attended PT again in late 2020, she reported that her pain had been present since her December 2019 Tdap vaccination. Exs. 9 at 7; 13 at 39. This record supports the conclusion that Petitioner's injury did not resolve prior to the end of the post-onset six-month timeframe.

### F.  Other Requirements for Entitlement

The record contains preponderant evidence that other requirements for entitlement are satisfied as well. Petitioner received a covered vaccine in the United States. Ex. 1. She averred that she has never received an award or settlement, or filed a civil action, for her vaccine-related injuries. Ex. 2 at ¶ 5.

### Conclusion

Based on my review of the record as a whole, I find that it is more likely than not that the onset of Petitioner's shoulder pain occurred within 48 hours of vaccine administration, and that all other SIRVA Table requirements are met. I find that the statutory severity requirement is satisfied by preponderant evidence, as are other requirements for entitlement. Therefore, Petitioner's motion for a ruling on the record that she is entitled to compensation is **GRANTED**.

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master